Annette HARDEN, Rose Thomas, Nickea Nicole Rowe, Dawn Michelle Rowe, Aline Black and the City Of Wilmington, a Municipal Corporation of the State of Delaware, Plaintiffs,

v.

The CHRISTINA SCHOOL DISTRICT, The Christina School District Board of Education, and James R. Durr, Dr. John Mackenzie, Gina Backus, Dr. Karl B. Brockenbrough, George E. Evans, Beverly A. Howell, David Resler, and Dr. Lillian M. Lowery (in their official capacities), Defendants.

C.A. No. 2832–VCS.

Court of Chancery of Delaware, New Castle County.

Submitted: May 18, 2007.
Decided: May 31, 2007.

John A. Parkins, Jr., Esquire, C. Malcolm Cochran, IV, Esquire, Gregory E.

Stuhlman, Esquire, Richards Layton & Finger, Wilmington, Delaware; John R. Sheridan, Esquire, City of Wilmington Law Department, Wilmington, Delaware, Attorneys for Plaintiffs.

David H. Williams, Esquire, James H. McMackin, III, Esquire, Morris James LLP, Wilmington, Delaware, Attorneys for Defendants.

## OPINION

STRINE, Vice Chancellor.

### I.  *Introduction*

The Neighborhood Schools Act, 14 Del. C. §§ 220–23 (the "NSA" or "Act") was adopted by the General Assembly in April 2000 to "establish and implement a plan for neighborhood schools in Northern New Castle County that is fair and equitable to all affected children in New Castle County."[1] By its plain terms, the NSA required the defendant Christina School District (the "District" or "Christina") to "develop a Neighborhood School Plan ... that assign[ed] every student within the district to the grade-appropriate school closest to the student's residence, without regard to any consideration other than geographic distance and the natural boundaries of neighborhoods."[2] Under the NSA, Christina was only permitted to deviate from a strict focus on geographic proximity if it could identify "substantial hardship[s]" that justified different approaches to assignment.[3] The Act also required that the Neighborhood School Plan that it compelled Christina to develop apply specified grade configurations for each of the District's schools. Christina was not allowed to avoid this requirement,

1.  14 Del. C. § 220.

2.  14 Del. C. § 223.

3.  *Id.*

but it was permitted to present an alternative plan using different grade spans "in addition to" a plan conforming to the statutory mandate if it believed such an alternative would better accomplish the NSA's goals.[4] That is, the District had a mandatory obligation under the Act to develop a Neighborhood School Plan that complied with the NSA's express terms and to submit that plan (along with an alternative plan if the District so chose) to the State Board of Education (the "State Board") for consideration and approval.

In developing an Act-compliant Neighborhood School Plan, Christina faced a serious geographic problem. The "Suburban" portion of its District, surrounding the town of Newark, was located 15 miles from its "City" portion, in Wilmington. The General Assembly, however, offered no accommodation in the NSA for this non-contiguous district design, nor did it use the Act to reconfigure the Christina District to include its City students in any of the school districts contiguous with the City. Instead, Christina was left to craft a Neighborhood School Plan for a District for which that concept makes little or no geographic sense.

In November 2001, Christina presented its first Neighborhood School Plan to the State Board of Education. That plan largely kept the District's existing feeder patterns and grade configurations in place, only realigning attendance patterns to account for building capacities in the District's schools. Finding that Christina's initial plan failed to comply with the NSA as a matter of law, the State Board directed Christina to develop another plan.

In May 2002, Christina made its second submission to the State Board. This time the District used the grade configurations required by the Act, but it relied on a massive capital spending program to support that initiative. As a preferred alternative, the District resubmitted its first plan, which proposed to maintain the District structure without change. The State Board rejected both of these plans, finding that the District had an obligation to present a Neighborhood School Plan that met the statutory grade configurations using its existing school capacity. In so ruling, the State Board acknowledged the unique predicament Christina faced and expressed its hope that the General Assembly would act to address Christina's problematic geography, but indicated that Christina needed to take action to comply with the Act.

In late 2003, Christina suggested that it would engage in a planning process to comply with the requirements of the Act. During the summer of 2004, the General Assembly amended the NSA to explicitly permit the District a third bite at the apple. But, by early 2005, it appeared that Christina was content to muddle along, here and there making changes to feeder patterns and closing a school, but not undertaking any effort to come up with a formal Neighborhood School Plan, as required by the Act.

In 2006, a new superintendent arrived at Christina, only to find that the District had mismanaged its finances in a serious way, necessitating layoffs, reductions in programming, and substantial borrowing from the State to continue operations. As part of the effort to address its problems, Christina approved a "Strategic Plan" in March of this year that contemplates the closing of two of Christina's City elementary schools, including one for the coming school year, and the redeployment of two other City schools toward purposes other than regular public education. Once im-

4. *Id.*

plemented, the Strategic Plan will enable all Suburban students in Christina to spend all 13 of their school years in Suburban schools. But for Christina students in the City of Wilmington, another reality looms.

Upon full execution of the Strategic Plan as it is currently envisioned, City students in Christina will attend one of two extremely large elementary schools in the City for their first six years of public education. Then, they will be dispersed to Suburban middle and high schools, spending their sixth through twelfth grade years some 15 miles away from their homes. As such, the Strategic Plan, when complete, will require City students to spend the majority of their public education—the final 7 of their 13 years in the system—in the Suburbs without any option to attend a middle or high school closer to home.

Moreover, no change to this dynamic can rationally be expected in the coming decade if the Strategic Plan proceeds as written. All told, the Strategic Plan will close four existing smaller elementary schools in the City to normal public school use, will offer no option for middle or high school programming in the City, and will commit the two City schools that had originally been built as middle schools to indefinite use as elementary schools. The Strategic Plan will also decouple referendum funding for development of a Suburban middle school from capital campaigns supporting renovations in the City, making the latter less likely to gain voter support from the District's overwhelmingly Suburban tax base.

This case comes before me now at the instance of parents of Christina students, and of the City of Wilmington, who together seek an injunction against the procession of the Strategic Plan. The plaintiffs allege, without contradiction from the District, that Christina has yet to submit a Neighborhood School Plan that complies with the Act's explicit mandates. In light of that fact, the plaintiffs ask me to enjoin the Strategic Plan, particularly the closing of the four City schools until Christina gains the State Board of Education's approval of a Neighborhood School Plan for the District that complies with the NSA.

The plaintiffs contend that whatever the educational merits of the NSA may be, the District is not permitted to ignore the Act and to proceed as if it did not exist. The consequences of allowing it to do so would be, say the plaintiffs, to allow the District to get away with providing a full span of neighborhood schools for its Suburban students, while precluding that option for its City students by closing their existing neighborhood schools and, as a practical matter, denying them any opportunity in the next decade or more to attend middle or high school in the City.

In this opinion, I rule for the plaintiffs. Without denying the difficulty faced by Christina, the court cannot ignore the District's failure to comply with the NSA or the adverse consequences that the plaintiffs face if an injunction does not issue. The issuance of an injunction preserves the right of the plaintiffs to compel the District to comply with the Act by developing a Neighborhood School Plan that addresses their needs as well as those of the District's Suburban students. Further, by preventing the four City schools from closing, an injunction will assure that the existing school facilities within the City remain available for the District's use toward that end.

This limited relief is well tailored to the potential harms that the plaintiffs confront. The process the plaintiffs seek is not one involving judicial involvement in the planning process; they simply ask that I require Christina to comply with the NSA and submit an Act-compliant Neigh-

borhood School Plan to the State Board of Education. The State Board, not this court, will then weigh the *important and complex educational factors* at stake and determine if the District's plan should be approved.

Although it is regrettable that the court must enjoin the plans of the cash-strapped Christina School District, the failure to do so would deny to the City students of Christina the benefits that the General Assembly believed would flow from the Act. By ensuring that further City schools are not closed until the Act's requirements are satisfied, an injunction preserves the chance for the plaintiffs to convince the District and the State Board that those schools should be utilized to meet their desire for schools close to their neighborhoods. When compared to the modest financial benefits the District expects from implementation of its Strategic Plan in the coming school year, the benefits of an injunction vindicating the statutory rights of the plaintiffs outweigh the costs.

## II. *Factual Background*

This case highlights just one example of the many challenges still facing the Delaware schools as a result of the de jure racial discrimination that was the official policy of this state for most of its history.[5] In *Belton v. Gebhart,*[6] this court ordered the desegregation of the Delaware public schools, finding that the separate school systems maintained by fiat of our state constitution were not equal and failed to satisfy even the lax standard of the United States Supreme Court's notorious *Plessy v. Ferguson*[7] "separate but equal" decision. In *Brown v. Board of Education,*[8] the United States Supreme Court did what Chancellor Seitz of this court had urged it to do in *Belton;*[9] it overruled *Plessy* and declared that de jure segregation was unconstitutional.

As is widely known, the desegregation of American public schools did not proceed expeditiously or without controversy; certainly, that was true in Delaware. In 1977, the U.S. Court of Appeals for the Third Circuit affirmed a federal district court decision finding that the effects of de jure discrimination on the public schools had not been adequately remedied in the northern portion of New Castle County, Delaware and ordered the implementation of an effective remedy.[10] After state authorities were found to have fallen short of the mark in their efforts to come up with a remedy on their own, the U.S. District Court for the District of Delaware implemented a mandatory desegregation plan for the schools of Northern New Castle County.[11]

5. Until 1995, the Delaware Constitution contained language in § 2 of Article X stating that "separate schools for white and colored children shall be maintained." *See* Del. S.B. 75, 138th Leg., 1st Sess., 70 Del. Laws, ch. 277 (1995) (belatedly striking that language as unconstitutional).

6. 87 A.2d 862 (Del.Ch.1952), *aff'd,* 91 A.2d 137 (Del.1952).

7. 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896).

8. 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

9. *See Belton,* 87 A.2d at 865 ("I believe the 'separate but equal' doctrine in education should be rejected, but I also believe its rejection must come from [the United States Supreme] Court.").

10. *Evans v. Buchanan,* 555 F.2d 373 (3d Cir. 1977).

11. *Evans v. Buchanan,* C.A. Nos. 1816–1822, Order at 11, 447 F.Supp. 982 (D.Del. Jan. 9, 1978).

Although most controversial in the suburban portion of New Castle County, the so-called "9–3" plan actually placed most of the burden of desegregation on the predominantly black students living within the City of Wilmington. City students rode the bus to Suburban schools for nine years of their education, while Suburban students were assigned to City schools for only three years. Shortly after the 9–3 plan was put into place, the schools of Northern New Castle County, which had been consolidated into one school district, were divided into four school districts.[12]

Three of the four—the Brandywine, Colonial, and Red Clay Districts—involved contiguous geographic units including both a portion of the City of Wilmington and a section of its surrounding suburbs. The fourth, the Christina School District, was quite different. Christina had a City portion, but its Suburban portion comprised the greater Newark area and was separated from Wilmington by 15 miles of interstate. This area had been included in the 9–3 remedial order lest a so-called "white flight" from the other portions of Northern New Castle County occur and defeat the intentions of the desegregation order.

After the initial tumult, including school closings, loss of students to private schools, and other adjustments that came with implementation of the 9–3 plan, the four districts settled in and lived under the plan for nearly twenty years. As part of the 9–3 plan, most schools kept their feeder patterns aligned so as to maintain their racial balance at a level where the percentage of black students was within 10% of the overall district average. This balancing function also helped avoid schools with concentrations of high-poverty students, as one of the many regrettable consequences of racial discrimination was a greater tendency for poverty among black students. By establishing racial diversity, the 9–3 plan also created greater socio-economic diversity in the schools. But this diversity came at a cost. For City students, it meant nine years outside their neighborhoods, three such years for Suburban students, and for many City and Suburban students, it meant relatively frequent changes in feeder patterns and irregular grade spans in many schools.

In 1995, the federal order requiring the four districts to desegregate was lifted, with the school districts being declared to have attained unitary status.[13] At around the same time, the General Assembly adopted measures to increase opportunities for students to choose schools that fit their particular needs through the enactment of school choice and charter school legislation.[14] Indeed, the first Delaware charter school was formed at the former Wilmington High School, in part to help the Red Clay Consolidated School District voluntarily maintain the diversity of that school, which had become an increasingly difficult task for it to achieve through mandatory student assignments. The end of the mandatory desegregation order, and the advent of charter and choice, also came in the midst of the State's implementation of a standards-based education reform and accountability plan, which caused many educators to focus more on helping their

12. See Evans v. Buchanan, 512 F.Supp. 839 (D.Del.1981) (assessing that division).

13. Coalition to Save Our Children v. State Board of Education, 901 F.Supp. 784 (D.Del. 1995), aff'd, 90 F.3d 752 (3d Cir.1996).

14. See Del. H.B. 144, 138th Leg., 1st Sess., 70 Del. Laws, ch. 180 (1995) (codifying the School District Enrollment Choice Program in Chapter 4 of Title 14 of the Delaware Code); Del. S.B. 200, 138th Leg., 1st Sess., 70 Del. Laws, ch. 179 (1995) (enacting the Charter School Act of 1995 as Chapter 5 of Title 14 of the Delaware Code).

students meet the challenging new standards than on changing where their students went to school.

In April 2000, the General Assembly recognized that one of the desires many parents sought to fulfill for their children through the end of federal court supervision, and the choice and charter programs, was the desire to attend school close to their homes. In order to spur the four Northern New Castle County School Districts (the "Northern NCC Districts") to change their feeder patterns to address this desire, the General Assembly adopted the Neighborhood Schools Act of 2000. As will be seen next, the current case results both from what the Act did and what the Act did not do.

### B. The Neighborhood Schools Act

The Neighborhood Schools Act was designed to "establish and implement a plan for neighborhood schools in Northern New Castle County that is fair and equitable to all affected children in New Castle County."[15] As understood by the General Assembly, and reflected in the preamble to the Act, that objective enjoyed "broad support among Delawareans" who desired "a public school system where children attend schools in their community," where transportation time and costs are minimized, where schools generate community pride and engender parental involvement, and ultimately where students are better able to study and learn.[16]

The NSA advanced these objectives by two means: (1) a non-mandatory process by which the General Assembly was to consider alternatives to the four-district configuration that existed for Wilmington and Northern New Castle County;[17] and (2) a mandatory set of requirements imposed on the existing four Northern NCC Districts to develop Neighborhood School Plans.[18] I describe each in turn, as the non-mandatory aspect of the first provision has affected Christina's ability to meet its mandatory obligations in a way that promised to benefit all of its students.

1. *Rationalizing School District Boundaries To Promote A System Of Fair And Equitable Neighborhood Schools In Northern New Castle County: A Non–Enforceable Provision Of The NSA*

To achieve the goal of a fair and equitable system of neighborhood schools, the first order of business one might expect to have been undertaken would have been the reconfiguration of the four Northern NCC Districts. After all, these Districts were designed for the implementation of a system that emphasized the creation of racially-diverse schools through mandatory student assignments, not for the purpose of educating children at the schools closest to their homes, within a system that promoted school choice and authorized charter schools. To move toward the goal of keeping children closer to home, the creation of geographically-compact and contiguous school districts might therefore have seemed the logical first step.

This is particularly true as applied to the City of Wilmington, which had been divided among the four Northern NCC Districts. Because of the interaction of that reality with the 9–3 plan, there was no traditional middle school in the City when the NSA was enacted,[19] and the only City

---

15.  14 Del. C. § 220.

16.  Del. H.B. 300, 140th Leg., 2nd Sess., 72 Del. Laws, ch. 287 (2000) (enacting the NSA).

17.  14 Del. C. § 222.

18.  14 Del. C. § 223.

19.  There was a middle school for the performing arts, which was housed in the same location as the Charter School of Wilmington.

high schools were the new Charter School of Wilmington (a school focused on math and science) and a vocational high school. The lack of school facilities in the City made developing a full continuum of grade spans for City students a tremendous challenge. Further, the absence of any entity with authority over all City school facilities and students compounded that difficulty. Instead of being governed in a coherent way by a single responsible school authority, the City schools and their students were handled piecemeal by the four distinct Northern NCC Districts.

Of those Districts, Christina was the worst positioned to address the needs of both of its City and Suburban students well. Each of the other Districts was at least contiguous with the City of Wilmington. Christina was not. The majority of Christina's 18,500 students hail from Newark and its suburbs, while only an 18% minority of the District's students reside in Wilmington.[20] These hubs are 15 miles apart and their populaces are also socioeconomically disparate. By way of example, Christina as a whole has a 40% poverty rate, but the City portion of its District tallies roughly twice that figure.[21] Moreover, despite growing diversity in its Suburban territory, a majority of Christina's Suburban students are white, whereas its City student population is predominantly black and Hispanic.

The NSA did not ignore these obvious problems. But it addressed them in a non-mandatory way. Rather than reconfigure the four Northern NCC Districts from the get-go, the NSA established a Wilmington Neighborhood Schools Committee to develop ideas of that kind.[22] That Committee was a 17–member body created to "review and analyze current public school feeder patterns, current resource allocations among the districts, current populations of children residing in the City of Wilmington attending public schools, and population projections for children residing in the City of Wilmington likely to attend public schools in the future."[23] The Committee was required to hold at least five public hearings and to "submit recommendations to the Mayor of the City of Wilmington and the City Council by January 3, 2001, concerning the creation of a Wilmington School District, neighborhood schools within the current district configurations, or neighborhood schools under some alternative district configuration."[24] After receiving the Committee's recommendations, the City Council and the Mayor of the City of Wilmington then had the obligation under the NSA to forward their plan to the General Assembly by March 15, 2001.[25] The General Assembly putatively required itself to act on the Committee's plan by June 30, 2001.[26]

**20.** JX 46.

**21.** The poverty rate is often approximated by the percentage of children in a school or district that qualify for the federal free or reduced lunch or "FRL" programs. Tr. at 29–30; *see also* JX 10 at A347 n. 77 ("The District used 50% FRL as the threshold for a high poverty school...."). If suburban students were moved out of the City as contemplated by the District's Strategic Plan, the remaining Wilmington elementary schools have been projected to have poverty rates of approximately 80%. *Compare* JX 53 (City

school poverty rates) *with* JX 46 (district-wide poverty rate).

**22.** 14 Del. C. § 222.

**23.** 14 Del. C. § 222(d).

**24.** 14 Del. C. § 222(e).

**25.** 14 Del. C. § 222(f).

**26.** *Id.* Although the language of the NSA requiring action of the General Assembly on the Committee's plan is phrased in mandatory

The Wilmington Neighborhood Schools Committee fulfilled its charge and delivered a report entitled "They Matter Most: Investing in Wilmington's Children and Delaware's Future" to the Mayor and City Council in January 2001.[27] That report recommended two options for a school system that would meet the needs of Wilmington's children. The Committee's first option was the creation of a Metropolitan School District consisting of the City of Wilmington, Red Clay, and Brandywine school districts that would function as a unified, geographically-compact, and contiguous school district, sharing its students and a strong common local tax base.[28] The second of the Committee's options was to convert the existing public schools in Wilmington to charter schools organized under a citywide governing body.[29]

The Wilmington City leaders also discharged their duties under the NSA. The City Council passed an ordinance endorsing the recommendations of the Committee supporting a Metropolitan or Charter School District encompassing Wilmington. The Mayor vetoed that ordinance on March 15, 2001.[30] Two weeks later, on March 29, the City Council acted to override the Mayor's veto.[31] That day, the approved plan was transmitted to the General Assembly.[32] That is, the plan was submitted two weeks late.

The General Assembly, however, never took any substantive action at all to address the Wilmington Neighborhood Schools Committee's proposal. Three bills relating to the plan were submitted, but none was ever put to a vote by both houses of the General Assembly.[33] More impor-

terms, its provisions are best read as self-admonitory. Unlike the portions of the Act imposing requirements on the General Assembly regarding the funding of Neighborhood School Plans, which expressly create a private right of action for citizens to enforce the Act in court, the section of the Act requiring action of the General Assembly on the Wilmington Neighborhood Schools Committee's plan has no enforcement mechanism. Compare 14 Del. C. § 222 with 14 Del. C. § 223.

27. JX 64.

28. Id. at 33–34. If the Committee's plan were adopted and the Brandywine and Red Clay Districts were to assume responsibility for the entire City, the Wilmington Neighborhood Schools Committee believed that "[a]ll three districts would need to be consolidated into a single district with a common tax base" to provide adequate resources to address the challenges presented by having more high-poverty students to educate. Id.

29. JX 64 at 35–37.

30. Tr. at 92; Letter from Mayor James M. Baker to City Council President Theodore Blunt Vetoing the Council's Proposed Neighborhood Schools Ordinance (Mar. 15, 2001), available at http://www.christina.k12.de.us/

neighborhood/Veto_Letter.pdf (expressing concerns regarding the difficulties and uncertainties inherent in adopting the Committee's recommendations as well as the potential for re-segregation to result from a Wilmington school district).

31. Tr. at 93.

32. Id.

33. See Letter from C. Malcolm Cochran, IV to the court (May 18, 2007) ("Legislative Summary Letter") (summarizing the parties' research concerning the legislative action on the Wilmington Neighborhood Schools Committee plan). The first bill introduced sought to extend the deadline in the NSA for the City's submission to the General Assembly to accommodate the delays arising from the veto and override. See Del. S.B. 78, 141st Leg. (introduced Mar. 20, 2001). It was passed by the Senate on March 22, 2001 and assigned to a House committee on March 27, 2001, but no further action was taken. Legislative Summary Letter at ¶ 2. The second piece of germane legislation was a Senate resolution extending the mandate of the Wilmington Neighborhood Schools Committee through January 1, 2002. See Del. S.J. Res. 10, 141st Leg. (introduced June 30, 2001). The resolu-

tantly, no bill was ever introduced to re-configure the four Northern NCC Districts along any different lines, much less the lines preferred by the Wilmington Neighborhood Schools Committee.[34]

Through inaction, the four Northern NCC Districts were left in place with their existing boundaries. This left them each to work in isolation on their required Neighborhood School Plans, the aspects of which I describe next.[35] For Christina, it meant having to adopt a Neighborhood School Plan for two communities divided by 15 miles of interstate.

tion was passed by the Senate on June 30, 2001—the date certain set in the NSA for General Assembly action—but it was never voted on by the House, which assigned the resolution to committee on January 2, 2002. Legislative Summary Letter at ¶ 3. The final bill considered by the General Assembly would have delayed the implementation of the NSA and established a Neighborhood Schools Commission to consider the issue. *See* Del. S.B. 295, 141st Leg. (introduced Jan. 24, 2002). It was introduced on January 24, 2002 and assigned to committee but never came up for vote. Legislative Summary Letter at ¶ 1.

34. The two options developed by the Committee work together. That is, the Committee suggests that the City in its entirety be consolidated into the Brandywine and Red Clay districts, creating a compact, geographically-sensible district that tracks well-accepted community boundaries. The Committee also suggested creating neighborhood schools within that district. But by its simultaneous consideration of a special charter district within the City, the Committee also underscored its understanding that neighborhood schools were likely to face special challenges in the City setting and would need special attention, funding, and programs if they were to be successful in attracting Suburban students voluntarily to reduce the concentration of high-poverty students in those schools, and also to attempt to make successful those of the schools that would, nonetheless, likely have high concentrations of poverty.

2. *School District Implementation Of Neighborhood School Plans: A Mandatory, Judicially-Enforceable Requirement Of The NSA*

By comparison to the non-mandatory aspects of the NSA concerning the Wilmington Neighborhood Schools Committee's recommendations, the Act's requirement that the four existing Northern NCC Districts develop individualized Neighborhood School Plans was a mandatory provision enforceable in court. On that front, the NSA's charge to the four Districts was unambiguous:

Although the Committee's suggestion was a logical one, the prospects for securing support for it and planning for its implementation in a time frame that proceeded the Northern NCC Districts' duty to come up with their own Neighborhood School Plans under the NSA seems, in retrospect, non-existent. Among the tasks that would have had to be undertaken would have been: redrawing district boundaries, reconciling the contractual rights of two different staffs; figuring out which administrative personnel were redundant and how to fairly treat them; considering what transitional choices for school attendance would be offered to current Colonial and Christina students who were to be educated by the new district; evaluating how to transfer the property rights of Colonial and Christina over their City schools to the new district; determining whether the new district should keep all of its local property taxes and addressing its revenue and other needs to tackle the challenges that would come from educating a more impoverished school population. And Mayor Baker's veto illustrates the substantive disagreements that had to be addressed before the Committee's plan would secure sufficient support for enactment into law.

35. The NSA encourages districts to "consider as part of their Neighborhood School Plans, inter-district school assignments for individual schools," but a host of obvious political realities and bureaucratic motivations make it unsurprising that inter-district solutions to these issues have, to date, shall we say, not flourished. *See* 14 Del. C. § 223(a).

"[T]he school boards of Brandywine School District, Colonial School District, Christina School District and Red Clay Consolidated School District shall develop a Neighborhood School Plan for their districts that assigns every student within the district to the grade-appropriate school closest to the student's residence, without regard to any consideration other than geographic distance and the natural boundaries of neighborhoods." [36]

The NSA gave the Districts some flexibility to deviate from strict geographical and neighborhood considerations by permitting Neighborhood School Plans to "assign students to schools based on factors other than geographic and natural neighborhood boundaries if a substantial hardship to a school or school district, student or student's family exists." [37] But the NSA required that all Neighborhood School Plan submissions to the State Board of Education present at least one proposal that "consist[s] of the following grade configurations:

(1) A lower-level school, or elementary school, consisting of either grades K–5 or grades K–6;
(2) A middle-level school, or junior high school, consisting of either grade 6 or 7 to grade 8 or 9; or
(3) An upper-level school, or high school, consisting of either grades 9–12 or grades 10–12." [38]

Through these requirements, the NSA mandated that the Northern NCC Districts review their school facilities and propose a configuration of their feeder patterns that would fill their available classroom capacity with the students living closest to those schools. If a District believed that substantial hardships justified a deviation from adopting the assignment pattern that would keep students closest to home, it could identify those hardships and propose deviations necessary to address them. Similarly, if one of the Districts believed that a grade configuration other than that contemplated by the statute "better accomplish[ed] the goals of [the NSA]," it could present an "alternative Neighborhood School Plan *in addition* to the plan based on the above [statutory grade] configurations." [39]

In developing its Neighborhood School Plan, or Plans, each of the Northern NCC Districts was required to hold at least five public hearings.[40] Following those hearings, the NSA compelled the Northern NCC Districts to submit their plans to the State Board on or before November 15, 2001.[41]

Once a District succeeded in getting a Neighborhood School Plan approved by the State Board, it was given 18 months to fully implement its proposal, and it stood to receive $1.25 million in transitional funding as well as annual transportation savings payments over the next ten years.[42] If, however, a District's initial plan was rejected by the State Board, it was given 60 days to resubmit an appropriate plan before the State Board was directed to ask the Attorney General's Office to initiate a lawsuit to compel compliance with the Act.[43] The NSA also expressly permitted private citizens to enforce the requirements of the Act concerning the

---

36. 14 Del. C. § 223(a).

37. *Id.*

38. 14 Del. C. § 223(b).

39. *Id.* (emphasis added).

40. 14 Del. C. § 223(c).

41. 14 Del. C. § 223(d).

42. 14 Del. C. § 223(d)-(e).

43. 14 Del. C. § 223(d).

development of Neighborhood School Plans, stating, "A citizen with standing may bring a private cause of action in a court of competent jurisdiction to enforce the requirements of this section [i.e., 14 Del. C. § 223]." [44]

## C. Christina's Efforts To Comply With The Neighborhood Schools Act

In a written decision issued on March 28, 2002, the State Board of Education approved the Neighborhood School Plans of the Brandywine and Colonial School Districts.[45] In the same opinion, it declined to accept the plans submitted by the Christina and Red Clay Districts.[46] Christina and Red Clay were required to resubmit compliant plans within 60 days.[47] Upon resubmission, the Christina plan was again rejected, but the Red Clay plan eventually gained the State Board's approval on its third try.[48] Thus, at present, Christina is the only one of the four Northern NCC Districts named in the NSA that does not have a plan approved through the NSA process in place for its students.

From the start, Christina faced enormous challenges in complying with the NSA. The problems were several. For one thing, Christina did not run its schools in the grade configurations contemplated by the Act.[49] For another, the District's population dynamics were shifting. Christina's Suburban base was expanding, particularly along the Route 40 corridor, more rapidly than its City population, increasing that already disproportionately-large slice of the District's enrollment pie.[50] Consequently, there were insufficient seats in Christina's Suburban schools for the expanding population there, while there were insufficient pupils in the District's City portion to fill the existing City school classrooms.[51]

This shift was exaggerated by the public school choice program through which many Suburban students desiring to go to school closer to home opted out of their assigned City schools and into closer Suburban schools.[52] Christina has also faced competition from both Suburban and City charter schools that, among other things, used geographic proximity as a recruiting tool. These schools have caused the District to lose students.[53] Together, the op-

---

44. 14 Del. C. § 223(g).

45. JX 10 at A366. Although the NSA only required the four Northern NCC Districts named in the Act to submit plans, it also permitted the other Delaware school districts to submit plans at their discretion. Id. at A300. This decision does not discuss the other districts that have availed themselves of that opportunity.

46. Id. at A366–67.

47. Id.

48. See JX 9 at A296 (rejecting the second submissions of Christina and Red Clay); JX 14 (approving Red Clay's third Neighborhood School Plan submission).

49. See JX 10 at A324 (describing Christina's grade configurations as thirteen elementary schools serving grades K–1 or K–4, six intermediate schools with grades 5–6, three middle schools of grades 7–8, and three high schools for grades 9–12).

50. Tr. at 139–40.

51. JX 9 at A292.

52. Tr. at 377.

53. During the 2006–2007 school year alone, a total of 2,129 students who lived within Christina's boundaries chose to attend charter schools. See JX 45 at A195. Of those students, 777 selected charter schools within the City of Wilmington, 636 attended the Newark Charter School, and the remaining 716 went to other Suburban charters. See JX 45 at A193 (indicating that 499 students who lived within the City and 278 from Newark and its suburbs chose to attend City charter schools).

tions made available to families by the school choice and charter school laws were outstripping Christina's ability to play catch up through its school assignment process.

From a facilities point of view, the District also faced challenges. Christina did not operate a middle or junior high school in the City.[54] Two of its City schools, Bancroft and Bayard, had been built as middle schools but had not been operated as such for many years, and thus required capital expenditures in order to bring them up to the standards currently expected in newly-constructed middle schools.[55] No high school option existed in the City either, as all three of the District's high schools were located in the Suburbs, and the District lacked any facilities suitable to house a high school in the City.[56]

Finally, looming over the District were other regrettable, and undeniable, realities. If a series of neighborhood schools was created in the City portion of Christina, and if Suburban students were not required to attend those City schools, roughly 80% of the students in the City's neighborhood schools would come from impoverished families.[57] Likewise, under a neighborhood schools feeder system of that kind, City students would attend schools predominantly comprised of minority students.[58]

When Christina submitted its initial Neighborhood School Plan to the State Board of Education on November 14, 2001,[59] the results showed the strain of addressing all these difficult, important, and conflicting considerations. In preparation for that submission, Christina had created a 35-member Committee in February 2001 to study the issue and make recommendations.[60] The Committee succeeded in realigning the District's grade configurations to comply with the NSA's preferred K–5, 6–8, 9–12 format, but the Committee plan called for nearly $40 million in additional state and local funds to renovate Bayard and Bancroft into City middle schools and to build two new elementary schools in the Suburbs.[61] The Christina Board rejected this "Committee Plan," electing instead to submit a plan that preserved the District's then-existing (non-Act-compliant) grade configurations with somewhat realigned attendance boundaries.[62]

The "Existing Plan" that Christina submitted to the State Board retained the District's grade configurations of K–1 or K–4, 5–6, 7–8, and 9–12 schools. Further, it perpetuated what the State Board

---

The total charter attendance is projected to increase for the 2007–2008 academic year as the Newark Charter School opens its doors to 650 more Christina students. *See* JX 45 at A195 (projecting enrollment at Newark Charter to grow from 636 to 1,286). Together, the decisions of these students siphon approximately $4 million in operating funds away from the District and, by reducing the District's enrollment figures, decrease Christina's funding by 54 staffing units. JX 45 at A194.

**54.** Tr. at 376–78.

**55.** *Id.*

**56.** Tr. at 146.

**57.** *See* JX 9 at A274 (recognizing that the average poverty rate as measured by the FRL population would be 82.4% if Christina created a set of City elementary schools).

**58.** *See* JX 32 (indicating that minority students accounted for between 67% and 92% of the student bodies at Bancroft, Bayard, Elbert–Palmer, Pulaski, and Stubbs, even before implementation of the Strategic Plan).

**59.** JX 10 at A323.

**60.** *Id.* at A324.

**61.** *Id.*

**62.** JX 10 at A325.

termed a "crazy quilt" pattern of assignment rooted in the "9–3" plan implemented as part of the desegregation litigation.[63] The State Board summarized the feeders employed in the Existing Plan as follows:

[S]tudents in grades K–4 living in Newark and its suburbs attend suburban elementary schools. Students in grades K–1 living in Wilmington attend K–1 elementary schools in the City. Wilmington children in grades 2–3 attend suburban (K–4) elementary schools. City students in grades 4–6 are assigned to intermediate schools in the City. Suburban students in grades 5–6 also attend school in Wilmington. All students in grades 7–12 attend middle and high school in Newark and its suburbs.[64]

As a consequence of this alignment, the State Board found that "Christina's City students attend five different schools, three of them by the 4th grade" and travel to the suburbs to attend classes for 8 of their 13 years of public education.[65]

In advocating for its Existing Plan, Christina contended that reconfiguring its schools by grade and assigning students based solely on geographic distance and neighborhood boundaries would "produce grossly overcrowded suburban schools; significantly underused City schools; and high poverty concentrations in several schools, thereby requiring significant additional resources that [were] not likely to be available."[66] The District did not, however, submit to the State Board an Act-compliant plan that manifested this parade of horribles and could serve as a counter-point to the Existing Plan. Consequently, the State Board rejected Christina's submission on the related grounds that it did not "comply with the NSA as a matter of law" and that "because only one plan was submitted, the State Board [could not] engage in the comparison anticipated by the Act."[67]

In its opinion, the State Board did recognize the "unique and difficult challenge" that Christina faced.[68] It noted that "[Christina's] non-contiguous boundaries and the lack of building capacity in relation to student population in Newark and its suburbs pose significant impediments to the development of a Neighborhood School Plan"[69] and summarized public comments relating to "the safety risk of long bus rides along Interstate 95" and the fact that "extended daily commutes are hard on young children."[70] But, the State Board did not excuse Christina from compliance with the NSA.

Rather than allow Christina to avoid the Act's requirements, the State Board reiterated the opinion of the Attorney General, who had interpreted the NSA as mandatory to "*require* that the affected districts submit a plan based on the statutory grade configurations" but enabling insofar as it "*permitted* the districts to submit another plan which the State Board may approve in place of the plan that meets the statutory requirements if it finds that the alternative plan would better accomplish the goals of the Act."[71] Because Christina failed to submit at least one compliant plan for

63. JX 9 at A275; JX 10 at A324.

64. JX 10 at A324.

65. JX 9 at A277.

66. *Id.*

67. *Id.*

68. JX 10 at A328.

69. *Id.*

70. *Id.* at A325.

71. JX 10 at A327 (emphasis in original) (quoting Opinion of the Attorney General, No. 02–IB04 (Feb. 11, 2002) submitted as JX 11).

consideration, the State Board directed the District to resubmit a compliant plan within 60 days.[72]

Christina's second submission to the State Board presented the Committee Plan, including its reliance on $40 million of unauthorized capital expenditures, as its purportedly NSA-compliant plan. Along with the Committee Plan, the District again submitted its Existing Plan, this time as its alternate and recommended proposal.[73] The State Board concluded that "neither Plan me[t] the requirements of the law and as a result, decline[d] to approve either."[74] The State Board sharply criticized the Existing Plan, stating: "It imposes an unconscionable burden ... on City children. The Plan sends City students to suburban schools (fifteen-Interstate miles from their homes) for eight of their thirteen years of public education. Worse, City students attend three different schools by 4th grade."[75] Although the State Board agreed that the Committee Plan would create the grade spans required by the NSA *"if fully implemented,"* it found the "very aggressive, perhaps unparalleled, expansion project" to be "highly unlikely to occur" and therefore "illusory."[76] In contrast to such plans, the State Board determined that the NSA contemplated "a realignment of the District's *existing* schools into the designated configurations."[77]

As notable as the State Board's determination that the Committee Plan did not comply with the NSA was its articulation of two of the consequences of that Plan. In one section of its decision, State Board criticized the Committee Plan for assigning 800 suburban students to City middle schools which were not their closest grade-appropriate schools so as to enable those schools to reach functional capacity and so as to decrease the poverty levels in those schools.[78] In another section, the State Board noted that the Committee Plan—by allowing City students to attend school in the City for more years and by allowing Suburban students to attend school in the Suburbs for more years—would create an "alarming" concentration of poverty in the resulting City schools reflected in 73.2% to 90.6% school poverty rates.[79]

In these sections of its decision, the State Board identified but did not link two of the factors most challenging to Christina's ability to develop and implement a Neighborhood School Plan in a way that is beneficial for its students. By simple math, if Christina offered a series of neighborhood schools in its portion of the City, and if it did not mandate that Suburban students attend those schools, approximately 80% of the students in those City neighborhood schools would likely be impoverished because its City neighborhoods are that poor. Put bluntly, if Christina was, as the State Board suggested it

72. JX 10 at A328.

73. JX 9 at A270–71.

74. *Id.* at A284.

75. JX 9 at A290.

76. *Id.* at A285–86 (emphasis in original).

77. *Id.* at A286 (emphasis in original). The State Board found support for this interpretation in § 223(f) which required all approved plans to be fully implemented within 18 months. *Id.*

78. JX 9 at A287 (criticizing the Committee Plan because it avoided capacity problems and alleviated high-poverty concentrations by assigning students fifteen miles farther away from the students' homes than any of the Suburban middle schools); *see also id.* at A291 (refusing to "trade one hardship for another").

79. *Id.* at A288.

should, to offer Suburban middle schools to its Suburban students, it would necessarily increase the poverty level of any City middle schools that were left, absent a non-existent magical strategy that would encourage Suburban students to voluntarily attend City schools when they had an option to attend a school closer to home. No miracle cure was available that allowed Christina in isolation to create a neighborhood school continuum for the entire District, while simultaneously avoiding the creation of extremely high-poverty schools in the City. Something—the option of true neighborhood schools for some students or the avoidance of high-poverty schools—had to give.

Even though it did not explicitly connect these concepts, the State Board noted in its second opinion the same difficulties Christina has had to confront all along because of its disjointed, but functionally-interdependent, physical plant.[80] This time, the State Board concluded that "regardless of how creatively one tries to reassemble the pieces, there is no solution to the [Christina] puzzle that ensures a fair and equitable education to all students, the explicit legislative goal that the Board has consistently sought to ensure."[81] As such, it encouraged Christina to explore an inter-district cooperation, as contemplated by the NSA, as well as potential solutions

beyond the pale of the Act itself.[82] To the point of inter-district cooperation, the State Board also called upon the General Assembly to consider the following acts: appoint a special master or commission to take on the issue, redraw the school district boundary lines, or allow creation of special districts, magnet schools or other configurations to address this issue.[83] None of these options was taken up.[84]

After Christina's second submission to the State Board was rejected, the consequences of that failure to gain State Board approval were uncertain. At that time, Red Clay shared the same predicament. And, at the time, the NSA only gave Districts the opportunity to make two submissions to the State Board. But it still set forth its mandate for the Districts to put in place a Neighborhood School Plan in unambiguous terms.

The General Assembly provided some relief to Christina, and a lot to Red Clay in an amendment to the NSA enacted in July 2004. That amendment provided an opportunity to make a third NSA submission to the State Board. This allowed Christina a third chance at compliance before it was vulnerable to a lawsuit.[85] For Red Clay, the amendment was even more helpful as it relaxed the application of the NSA as to any District where 40% or more

80. *See* JX 9 at A292 ("[T]here are insufficient school seats in the suburban portion of the district to accommodate all suburban students, and there are insufficient numbers of urban students to fill more than a small fraction of the seats in the urban schools.").

81. *Id.*

82. *See* JX 9 at A293–95 (listing options).

83. *Id.*

84. The record does reveal one inter-district option that Christina considered, but this option actually illustrates why Christina cannot

solve its long-term problems without action by the State. During 2004, Christina apparently considered taking over Colonial's portion of the City. *See* JX 39 (describing preliminary negotiations). That is, rather than the more logical solution of having the City-contiguous districts take over Christina's portion of the City, the only inter-district option available to Christina was taking over more of the City. This suggests that none of the other Northern NCC Districts have been anxious to take on the responsibility for educating the (mostly economically impoverished) students who live in Christina's City territory.

85. JX 13.

of its students attended a school selected through a choice program.[86] After this amendment, Red Clay applied again for the third time and finally had its Neighborhood School Plan approved.[87]

Although Christina knew it could tender a third proposal to the State Board as a result of this amendment, it never exercised that option. In late 2003, Christina's then-Superintendent, Joseph Wise, wrote a letter to State Board President Joseph A. Pika suggesting that the District was embarking on a process to address the requirements of the Act.[88] But by late–2004, that project had been abandoned. In a letter dated, October 5, 2004, State Board President Pika told Wise that "[i]f the State Board [did] not receive the District's submission . . . by November 8, 2004, [it would] assume that the District [did] not intend to seek further review from the State Board." [89] No submission was made by that deadline. A note on Superintendent Wise's copy of that letter indicates that he contemplated that the District would respond to the letter, but no response was ever generated.[90] No further action was ever taken by the District to comply with the NSA.[91] Consequently, Christina still has no Neighborhood School Plan in place.

### D. The Christina Transformation Plan And Strategic Plan

Despite Christina's failure to secure approval from the State Board for any of its Neighborhood School Plans, no remedial action was ever taken by the State Board and Attorney General against the District.[92] As a result, the District simply proceeded on its course, viewing itself as having satisfied whatever obligations the NSA imposed on it by having made two submissions to the State Board, regardless of the fact that both of those submissions had been rejected as having failed to comply with the Act.

The failure of the District to develop an Act-compliant plan did not mean that the District stopped making changes to feeder patterns or schools. Rather, the District has charted at least two plans for its students and facilities since the enactment of the NSA.

Both of these plans draw on a history of capital referenda dating back to 2002. In

---

86. *Id.*

87. JX 14.

88. JX 43.

89. JX 44.

90. *Id.*

91. JX 65 at ¶ 8.

92. As discussed, the NSA provided for both the Attorney General's Office and for private citizens to enforce its terms. *See* 14 Del. C. § 223(d) (Attorney General) & § 233(g) (private citizens). The NSA arguably imposed a mandatory duty on the State Board to ask the Attorney General to act. Because the language of the NSA relating to referrals to the Attorney General speaks to situations when a district fails to submit a plan "in conformance with this subchapter" within 60 days of having its first plan rejected, it implies that the State Board is required to ask the Attorney General to bring suit against Christina to bring it into compliance with the Act. That is, the Act implies that the State Board should give a district a second chance to comply before asking the Attorney General to sue. The 2004 amendment to the NSA added a third chance. But once those chances had been exhausted (or foregone) and compliance had still not been attained, § 223(d) suggests that the State Board "shall" refer the matter for judicial enforcement. Regardless of whether that was the intention of the statute, or not, the State Board never made such a referral. The arguable ambiguity is whether this mandatory obligation only extends to making districts file a second plan with the required alacrity, rather than requiring districts to file a compliant plan.

the spring of that year, the District ran a major capital referendum that approved "renovations to elementary schools, new air-conditioning in schools across the district, and the construction of two new schools in the Bear–Glasgow Route 40 corridor, as well as a new 840–seat elementary school and an 800–seat middle school."[93] The elementary school was slated to open at a site located on Porter Road, and the middle school was proposed for the site of a former Astro Power facility.[94]

In anticipation of the expanded capacity in the suburbs, Christina approved a "Transformation Plan" in the spring of 2004.[95] As part of that initiative, the District closed the Drew and Pyle Elementary School in the City of Wilmington to accommodate the District's offices, reassigned the students from Drew/Pyle to Bayard Elementary, and, to make room for these students, shifted students who would have attended Bayard (in the City) for sixth grade to the Shue/Medill Middle School (in the Suburbs) for that year.[96] The Transformation Plan also opened 480 new fifth grade seats at eight suburban elementary schools as well as 180 second grade and 120 third grade choice seats at three City elementary schools.[97] Together, these changes moved the District towards its goal of creating more sensible grade configurations for its students. Until the completion of the new Suburban schools funded in the 2002 referendum, however, the Suburban elementary and middle schools were anticipated to be more than 220 and 1400 students over capacity, respectively, while the City elementary schools would be more than 2500 students under capacity.[98]

The process of selecting, purchasing, and developing the Porter Road and Astro Power sites, however, took longer than expected and involved higher than projected costs. By now, the District has exhausted its funding with the Astro Power construction less than 65% complete and without a single shovel of dirt having been excavated at Porter Road.[99] To complete these projects would cost millions.

To address its capital funding challenges, Christina attempted to secure additional funding through a capital referendum in January 2006. At that time, the District sought funding to complete its projects at the Porter Road and Astro Power sites,[100] as well as to reconfigure the District's grade configurations and commence several other projects including the renovation of the Bancroft School for use as a City middle school.[101] The District's voters were unwilling to support that proposal, defeating the referendum and forcing Christina to soldier on without additional funds. Consequently, the District's construction projects remained incomplete.

In this same period, Christina went through a transition in leadership, with defendant Lillian Lowery replacing Joseph Wise as Superintendent of the District.

---

93. Tr. at 139.

94. *Id.* at 140–41.

95. *See* JX 16; JX 39 (describing the plan).

96. JX 65 at ¶ 9.

97. *Id.* at ¶ 10.

98. JX 16 at A427.

99. Tr. at 140–42; *accord* Tr. at 416.

100. Tr. at 495 (Porter Road); Tr. at 177 (Astro Power).

101. Tr. at 177–78; *see also* Christina School District Referendum Ballot (Jan. 26, 2006), *available at* http://www.christina.k12.de.us/Archive/Referendum/2006/pdf/Referendum_Ballot_Detail.pdf (last visited May 30, 2007) (explaining ballot items).

Within weeks of her appointment, Lowery and State educational and audit authorities discovered that Christina was in a financial crisis. The emergency expedited financial review completed in April 2006 on the heels of this news concluded that the District was operating at a $17 million deficit and needed a $20 million loan from the State to meet its operating expenses.[102] As a result of these tight finances, the District was not only unable to complete its building projects, but also had to cut nearly 600 jobs, and lacked any real flexibility in its budget.[103]

Hoping to begin emerging from a crisis-driven agenda, Christina began developing, in early 2007, a new "Strategic Plan" which it hoped would curry greater support from its families and tax base.[104] In that initiative, which the Christina Board approved on March 13, 2007, the District set forth a strategy to bring its facilities closer in line with its educational philosophy concerning grade configurations (for the benefit of its own students and to better compete with charter schools) and to trim its budget to be able to repay its debts and continue to operate.[105] Further, to appeal to the voters who had supported the 2002 referendum but were skeptical given the District's track record of grand, but unfulfilled, ideas and financial mismanagement, the Strategic Plan proposed to combine the existing funding for Porter Road and Astro Power into one fund to develop a combined K–8 elementary and middle school that I will refer to as the "Astro School." In that manner, the District hoped to make use of its 65%-completed structure and to rebuild its credibility with voters by delivering on the promise of increased Suburban seats it made in 2002.

Although the Strategic Plan has many elements, the most critical are listed below:

- Close and lease the Elbert–Palmer School in the City in June 2007;

- Close and lease the Stubbs School in the City in June 2008;

- Convert the Pulaski and Douglass Schools in the City to purposes other than the school purposes to which they are currently assigned;

- Transfer all K–5 students in the City of Wilmington to the Bayard and Bancroft Schools;

- Move the current sixth graders at Bayard and Bancroft to Suburban schools and open 240 additional fifth grade choice seats at four Suburban elementary schools that do not currently offer fifth grade to handle the concentrated influx of students at Bayard and Bancroft;

- Conduct a $7.2 million capital referendum to consolidate funding to complete a K–8 school at the former Astro Power site near Glasgow; and

- Execute new feeder patterns district-wide in school year 2007–2008.[106]

Upon its completion, the Strategic Plan will create neighborhood schools for the District's Suburban students, never requiring them to travel into the City to attend classes. By contrast, the Strategic Plan will require City children to endure bus rides into the suburbs for the last 7 of

---

102. Tr. at 383–85.

103. *Id.*

104. *See* JX 45; JX 52 (describing the District's vision).

105. *See* JX 65 at ¶ 13 (noting that the Strategic Plan was adopted by a 4–2 vote).

106. JX 65 at ¶¶ 14–19; *accord* JX 45 at A187–88.

their 13 school years.[107] This new configuration will result because the District decided only to complete its development of the Suburban Astro School, rather than combining that construction with a reconfiguration of the Bancroft School in the City as a middle school. Christina considered renovating Bancroft, but ultimately decided to omit that proposal, which would have required an additional $11.3 million to upgrade science labs, locker rooms, and many other aspects of the Bancroft physical plant, because it felt that voters would be unwilling to fund the $18.5 million needed to complete both the Suburban and City projects.[108]

As a consequence of decoupling the renovation of Bancroft from the completion of the Astro School, the District recognized that the ultimate passage of a later referendum to create a City middle school was far from certain given that over 80% of its base resided in the Suburbs.[109] Thus, as approved, Christina admits that the Strategic Plan will make it unlikely that a City middle school will be created in the next decade and a virtual impossibility that such a school might open before 2009.[110]

The Strategic Plan will also have a more immediate impact on the residents of the City of Wilmington. If it is fully implemented, the Strategic Plan will close four schools in City communities, including the Elbert–Palmer School this coming year, and the Stubbs School the following year. These facilities would then be put to other uses or leased to bolster the District's bottom line. In either event, although the District would continue to own the facilities, they would no longer be immediately available for school purposes.

In the case of Elbert–Palmer, if it is closed, it will be leased to the Edison Charter School, which will begin holding classes there, initially for a small group of students in grades K–3.[111] Students now at Palmer in K–2 may have a chance to attend school there next year.[112] Palmer students now in other grades would not. Under the terms of the proposed lease, the school would not be available for District purposes for at least six years under the proposed lease which provides for a one-year initial lease term followed by a five-year renewal term at the tenant's option.[113] The lease would generate $45,000 in rent during the first year for the District, and would escalate by $5,000 each year thereafter.[114] Closing Elbert–Palmer will also save Christina approximately $500,000 a year in annual operating costs.[115] To that end, Christina has already taken the first step required of it by declaring the Elbert–Palmer school as an excess facility on April 24, 2007.[116]

In contrast to the financial gains the City may realize by closing Elbert–Palmer, the parents of the students of that school will lose not only a community bulwark, but also a small, safe, and academically-challenging environment for their children. After consolidating all of the City's K–5

107. JX 65 at ¶ 15.

108. JX 46 at CSD 3402.

109. Tr. at 471–72.

110. Tr. at 413–15.

111. Tr. at 433–34.

112. Tr. at 437.

113. JX 68 at § 1(b) (stating "the Lease Term shall be automatically extended for one (1) additional period ... of five (5) years ... unless Tenant shall provide written notice to the Landlord ... canceling such extension").

114. *Id.* at § 1(c).

115. JX 17 at 53.

116. JX 65 at ¶ 21.

students at Bancroft and Bayard, the District will have abandoned its smaller schools in favor twin schools of approximately 1,000 students each. These institutions will not only be immense by elementary school standards, but also will have poverty rates of approximately 80%.[117] These high poverty and high population numbers will generate funding units to enable school administrators to provide additional resources—such as lower class sizes, and a few more counselors, and reading instructors—for these at-risk students, but Christina admits that it is far from clear whether these resources will be sufficient to meet the challenges of educating nearly 1,000, mostly high poverty, elementary students in the same place.

Even before factoring in the increased size of these schools, the existing differences between the large school, Bancroft, and the small school, Elbert–Palmer, are notable. If Elbert–Palmer students are relocated to Bancroft, they will move from a school rated "Superior," the highest rating awarded by the State Department of Education in 2005–2006, to Bancroft, which bears the lowest rating of "Academic Watch."[118] They would also transition from a school with a suspension and expulsion rate of 2% and only two reported crimes or Department of Education offenses to a school with a 12.5% suspension and expulsion rate and over 100 reported crimes and offenses.[119] As such, the plaintiffs who are the parents of these students are skeptical that such a move would be in their children's best interests.

### E. The Plaintiffs Promptly Challenge The Strategic Plan

■ Inspired by the imminent closing of Elbert–Palmer and the long-term changes projected for their communities, the plaintiffs in this case challenge Christina's Strategic Plan on the grounds that it does not comply with the mandate of the NSA.[120]

117. *See* JX 45 at A196 (projecting 2007–2008 enrollment at Bancroft and Bayard to be 900 and 995 students, respectively); JX 53 at 6 (noting poverty rates of 78.02% and 81.58% for Bayard and Bancroft after the consolidation).

118. Tr. at 12–14. The difference that these relative rankings imply should not be overstated. Elbert–Palmer satisfied all eight of its performance metrics, but because of its size was exempted from being assessed on others on which Bancroft was judged. Bancroft met all eight of the metrics that Palmer did, and reached 12 of its 14 assessment goals, missing the mark by only 6% participation related to its English Language Learner program and in the performance of a set of special education students, a population that Palmer lacked. *See* Tr. at 285–90 (discussing these results).

119. *Compare* JX 55 (Elbert–Palmer School Profile) *with* JX 59 (Bancroft School Profile).

120. *See* Pre–Trial Stipulation at § II, ¶¶ 12–18 (listing and describing the plaintiffs, Annette Harden, Rose Thomas, Nickea Nicole Rowe, Dawn Michelle Rowe, Aline Black and the City of Wilmington).

Christina has challenged the standing of the City of Wilmington in this action because it is a municipal corporation, not a human "citizen." I find that term "citizen" as used by the NSA in 14 Del. C. § 223(f) is broad enough to include the City of Wilmington. A reference to a "citizen" in a statute can be "meant to include a corporation." *Zazanis v. Jarman*, 1990 WL 58158, at *3 (Del.Super.1990). More importantly, allowing affected municipalities to enforce § 223 seems wholly consistent with the purpose of the NSA. *E.g., Kelley v. Mayor and Council of the City of Dover*, 300 A.2d 31, 38 (Del.Ch.1972) (stating that "statutory and constitutional provisions must be construed to determine whether their benefits were intended to be conferred on corporations"). The preamble to the NSA specifically points out the community value of neighborhood schools. Moreover, § 222 of the NSA recognizes the special interest Wilmington has in the issues addressed by the NSA. The failure of § 223(f) to mention the City of Wilmington, as opposed to citizens, is not, as Christina argues, fatal to

They claim that the District is currently in violation of the NSA because it has never adopted or implemented a Neighborhood School Plan as required by the Act. Rather than comply with the process outlined by the NSA, the plaintiffs assert that Christina is attempting to avoid the mandate of that Act through its Strategic Plan. If allowed to proceed, the plaintiffs allege that their children will be deprived of the chance to be educated in the grade-appropriate neighborhood school closest to their homes, a chance that the NSA guaranteed. As such, the plaintiffs seek an injunction to preserve that option for themselves until such time as the District obtains the State Board of Education's approval of a conforming Neighborhood School Plan setting forth the District's future direction.[121]

Christina opposes the plaintiffs' requested remedy but does not seriously dispute the fact that it has not substantively complied with the NSA. The Christina Board voted to approve the Strategic Plan by a margin of 4–2.[122] In taking that step, the Board did not mean for that Plan to bring the District into compliance with the NSA.

As the Superintendent, Lillian M. Lowery, testified:

"[W]hen we went into the strategic plan, we were not thinking Neighborhood Schools Act. We were thinking the things that I said, the fiscal situation, the academic data for our students, the resources that we had available . . . the existing facilities. So you're right, we haven't had a conversation about Neighborhood Schools Act. We just went . . . ahead with an academic plan, and then [the] facilities [were] included as a subset of how we did that. So you're right, we didn't have that conversation with the community at large as a Neighborhood Schools Act plan." [123]

Despite these admissions, the District argues that even though it has never obtained state approval under the NSA, it is discharged from that obligation by its prior submission of two (albeit non-conforming) plans to the State Board. Further, the District references the State Board's decision denying its second submission, which stated, "[T]here is no solution to the

the City's standing. Rather, it might better be read as reflecting the General Assembly's understanding that other municipalities, like Elsmere, Newark, or Newport, might have an interest in protecting schools within their borders. In this regard, I am also aware that litigation is costly for all individuals, and may be beyond the reach of those in poverty. Reading the Act as giving the City standing provides a mechanism for the concerns of disaggregated parents to be litigated at the instance of their local elected officials.

In any event, the arguments about Wilmington would not, however they were resolved, affect the outcome. Because the claims of the parents and the City were identical and focused almost exclusively on the educational issues facing the City's children, the same result would obtain even if the City were excluded from this litigation. Although it may be true that the City has unique interests tied to the economic development of its communities in the Christina territory and its tax base, those were not advanced in depth at

trial and do not form the basis for the City's desired relief. See Tr. at 97 (asserting that the closing of Elbert–Palmer will "pull the rug out from under" the "massive effort" currently in process by the City to revitalize the South Wilmington community where that school is located); Tr. at 100 (explaining that Elbert–Palmer is "at the heart of what [the City is] trying to do" in the South Wilmington community).

121. The plaintiffs also formulate their claim that the NSA was violated as a federal constitutional claim. They do so by saying that the violation of the rights under the NSA deprived them of due process of law. Because I can redress their injury by addressing the statutory violation, I need not, and do not, consider this constitutional claim.

122. JX 65 at ¶ 13.

123. Tr. at 426.

puzzle that ensures a fair and equitable education to all students," as a justification for failing to take any further actions toward creating neighborhood schools within its misshapen boundaries.[124]

As a consequence of its unique structural challenges and current financial straits, Christina also argues that enjoining its Strategic Plan will do more harm than good. In total, the District calculates it will lose nearly $550,000 during the next school year.[125] As important, Christina says it will be further delayed in carrying out important school projects including the completion of its remaining construction at the Astro Power site and the reconfiguration of its schools into elementary, middle and high school grade spans. These will, in turn, diminish the educational opportunities for its students and increase the costs of these reforms in the future.

In essence, Christina argues that it should not be punished for making the best of a bad situation. It points out that its Strategic Plan will achieve the grade configurations required by the NSA if allowed to be fully implemented and will offer shorter commutes for all of its students during the formative K–5 years. For those reasons, the District argues that it should be permitted to implement its Strategic Plan without being required to comply with the NSA.

124. JX 9 at A292.

125. JX 17 at 53; JX 68 at § 1(c).

126. *E.g., Korn v. New Castle County*, 2005 WL 396341, at *8 (Del.Ch.2005); *Draper Communications, Inc. v. Delaware Valley Broadcasters*, 505 A.2d 1283, 1288 (Del.Ch.1985).

127. *E.g., Cornerstone Brands, Inc. v. O'Steen*, 2006 WL 2788414, at *4 (Del.Ch.2006); *see also Weinberger v. UOP, Inc.*, 1985 WL 11546, at *9 (Del.Ch.1985), *aff'd*, 497 A.2d 792 (Del. 1985) ("[E]quity will not suffer a wrong without a remedy.").

To address these contrasting positions expeditiously, discovery, pre-trial briefing, and a two day trial were completed in less than two months after the complaint was filed on March 23, 2007. The remainder of this post-trial decision explains how I have resolved the parties' dispute.

### III. *Legal Analysis*

■ The injunction standard implicated by plaintiffs' claims is well established. To warrant permanent injunctive relief, the plaintiffs must succeed on the merits of their case after a full hearing, demonstrate that irreparable harm will result in the absence of an injunction, and prove that, on balance, the equities weigh in favor of issuing the injunction.[126] Should more tailored relief be necessary, this court is empowered to fashion any remedy required by equity.[127] I proceed in the traditional manner, starting with the merits, and then finishing by applying the factors necessary to determine whether equity weighs in favor of the issuance of an injunction.

### A. *Has Christina Violated The Neighborhood Schools Act?*

■ The merits determination is easier than usual. Both the language and intent of the NSA are unambiguous.[128] Moreover, the NSA has already been extensively examined by the State Board of

128. In interpreting the NSA, the court applies well-settled principles of statutory construction. *See In re Last Will and Testament of Palecki*, 920 A.2d 413, 422–25 (Del.Ch.2007) (explaining that where there is only one plausible textual reading of a statute, the court is charged with applying the statute's literal mandate unless doing so would work an absurd result not contemplated by the legislature); *accord Newtowne Village Service Corp. v. Newtowne Road Development Company, Inc.*, 772 A.2d 172, 175–76 (Del.2001); *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del.1985).

Education, which, on two occasions, determined that Christina had failed to submit a Neighborhood School Plan that complied with the requirements of the Act. First, on March 28, 2002, the State Board concluded that "Christina's [initial] plan ... does not comply with the NSA as a matter of law." [129] Then, again, on March 20, 2003, the State Board found that "neither Plan [that Christina resubmitted] meets the requirements of the [NSA] and as a result, declines to approve either." [130] Although the parties have not focused upon this point, Christina had a right to seek review of those adverse determinations under the Administrative Procedures Act and did not do so.[131] Moreover, Christina has not argued in this case that those determinations of the State Board of Education were erroneous. It is therefore essentially undisputed that Christina never submitted to the State Board of Education a Neighborhood School Plan that complied with the unambiguous requirements of the NSA.

By the Act's plain terms, a compliant Neighborhood School Plan must assign students to the grade-appropriate school closest to their homes per § 223(a), subject to only such limited exceptions as are necessary to avoid identified "substantial hardship[s]," and must use the grade configurations specified in § 223(b). Although the Act enables a district to submit an "addition[al] plan" using "alternative [grade] configuration[s]" that the district believes better serve the Act's goals, the obligation to submit a Neighborhood School Plan that complies with the statute's primary elements is mandatory.[132] In fact, Christina admits as much, stating that "The text of the NSA reveals an intent to require the development and submission of a comprehensive neighborhood school plan assigning every student to the grade-appropriate school closest to their residence, and implementing the grade configuration identified by the statute." [133] Despite acknowledging its duty under the Act to submit a Neighborhood School Plan that captured these minimal requirements, Christina never submitted to the State Board any proposal that divvied up its existing classroom capacity in that manner.

Instead, Christina's first submission presented a plan that avoided the statutory grade configuration element in its entirety, keeping the District's prior grade spans and feeder patterns in place. That proposal, the State Board concluded, was so noncompliant that the Board considered it "unnecessary and wasteful" to analyze the other school assignment components of

---

**129.** JX 10 at A327.

**130.** JX 9 at A284.

**131.** The State Board of Education recognized that it was subject to the Administrative Procedures Act in exercising its statutory powers, and that its review and approval process constituted a "case decision" under that Act. *See* JX 10 at A300 (citing 29 Del. C. § 10102(3) and 29 Del. C. § 10161(a)(11)). Consequently, Christina, as the "party against whom a case decision has been decided," had a right to appeal the State Board's decision to the Superior Court within 30 days of its issuance. 29 Del. C. § 10142. But Christina never

challenged the State Board's ruling in that forum.

**132.** Both §§ 223(a) and 223(b) employ mandatory "shall" language in setting forth their primary requirements, while carving out the Act's limited exceptions with permissive "may" constructions. *E.g., Miller v. Spicer,* 602 A.2d 65, 67 (Del.1991) ("The use of the verb "shall" in legislation generally connotes a mandatory requirement while the verb "may" is deemed permissive.").

**133.** Defendants' Answering Brief (Apr. 27, 2007) at 15.

that plan.[134]

Similarly, on its second submission, Christina again ignored the Act's mandate that students be assigned to the grade-appropriate school closest to their homes by proposing assignments to schools that were not in existence and functional at the time the District submitted its revised plan. The use of existing facilities rather than a reliance on new construction is implicitly assumed by the Act itself,[135] and was confirmed by the State Board in its prior decision, which stated that "the NSA does not require new school construction," that "new school construction is a lengthy and uncertain process," and that new construction "is a result ... the State Board should not mandate absent legislative direction to the effect." [136] Consequently, the State Board denied Christina's second submission, calling its $40 million capital requirement and extensive building campaign "very aggressive," "highly unlikely to occur," and "illusory" before concluding that it "fail[ed] to satisfy the student assignment requirements of Section 223(a)." [137]

Thus, to date, Christina has never disputed the NSA's mandate, but it has also never done what the plain terms of the Act require. It has never taken its existing stock of school space, attempted to use that capacity to assign students to the schools closest to their homes in the grade configurations specified by the NSA, and then adapted those assignments only insofar as necessary to avoid specific substantial hardships. Put simply, that was the mandate of the NSA—a mandate Christina has not followed.

To avoid the consequences of this substantive noncompliance, Christina raises two unpersuasive arguments. Initially, the District says that because it followed the procedural mandates of the NSA by holding hearings and making two Neighborhood School Plan submissions to the State Board of Education, its obligations under the Act should be considered discharged even though it never submitted a Neighborhood School Plan meeting the statutory criteria. Alternately, Christina asserts that it should be excused from compliance with the NSA because of the insurmountable challenges presented by the geography and socioeconomic character of its District.

The problems with Christina's first argument—that, in essence, the District was only required to twice *try* by following the Act's submission process, but not actually *comply* with the Act's substantive policy mandates—are several. The substantive goals of the Act would be a nullity if, as Christina says, all that was required of it was to convene a series of meetings and offer up two sheaths of papers designated as Neighborhood School Plans for consideration by the State Board, however noncompliant those plans were with the substantive requirements of the NSA. To accept that claim would make compliance with subsections (c) and (d) of § 223, which require public hearings and set deadlines for plan submissions and resubmissions, the only mandatory obligation of the affected districts, rendering the independent and substantive provisions of subsections (a) and (b) of § 223 purely hortatory. Such a reading would literally codify the

---

134. JX 10 at A323.

135. *See* 14 Del. C. § 223(a) (implicitly requiring use of existing grade-appropriate schools); 14 Del. C. § 223(f) (requiring implementation of Neighborhood School Plans within 18

months, a period too short to undertake new construction).

136. JX 10 at A321–22.

137. JX 9 at A285–87.

trite phrase "form over substance." None of the Act's words support such a cramped and peculiar reading, and neither does its preamble, purpose, or legislative history.[138]

By its plain terms, the NSA contemplates at least two enforcement mechanisms when a district fails to comply with its obligations under the NSA. One directs the State Board promptly to ask the Attorney General to take whatever legal action is necessary to bring a district into compliance if a district does not file a second Neighborhood School Plan in conformity with the Act submission within 60 days after its initial plan was rejected for not meeting the requirements of the Act.[139] As noted previously, that mandatory enforcement mechanism is arguably ambiguous because it is not as clear as it might be whether that part of the Acts mandates an enforcement request from the State Board only when a district acts without the required alacrity, rather than when a district submits a plan in a timely way but the plan itself does not comply with the requirements of the NSA.[140] On the other hand, certainly nothing in the Act renders the State Board and Attorney General powerless to make the *discretionary* determination to take legal action to bring a district into substantive compliance with the NSA.

But the other enforcement mechanism expressly in the NSA makes it absolutely clear that Christina's argument that it only

had to try, not comply, is without merit. That enforcement provision allows a citizen to bring a private cause of action to enforce the requirements of § 223(f), the section that requires districts to implement a Neighborhood School Plan reflecting the statute's emphasis on geographic proximity as the primary basis for determining where students go to school.

The obvious purpose for that cause of action is to give affected citizens the clout to hold school districts accountable for failing to implement a Neighborhood School Plan that substantively meets the Act's requirements. Christina's proffered alternative to that intuitively and linguistically sensible conclusion—namely, that the General Assembly provided for an express cause of action but only for the purpose of requiring a district to submit two plans to the State Board in the required time frame, however non-conforming in substantive terms—is bizarre indeed.

The General Assembly's passage of an amendment giving districts a third chance to submit a conforming plan did not alter the substantive import of the private right of action codified in the NSA. The amendment is best viewed as a third chance bill that gave districts who were not in conformity a final chance to get into voluntary compliance before they faced legal exposure for non-compliance.[141] This view is confirmed by the State Board President's

---

**138.** The Act's words and its preamble evidence the naturally greater concern one would surmise the General Assembly would have for the substantive ends of the Act over the process for achieving those ends. *See* 14 Del. C. § 220 (stating that it is "the intent and purpose" of the NSA "to establish and implement a plan for neighborhood schools ... that is fair and equitable"); Del. H.B. 300, 140th Leg., 2nd Sess., 72 Del. Laws, ch. 287 (2000) (lauding the substantive benefits of neighborhood schools in its preamble). The preamble to an act and its legislative history are properly consulted as aides to statutory

construction. *See, e.g., State v. Lillard,* 531 A.2d 613, 617 (Del.1987); *Carper v. New Castle County Bd. of Ed.,* 432 A.2d 1202, 1205 (Del.1981).

**139.** 14 Del. C. § 223(d).

**140.** *See supra* note 92.

**141.** Del. H.B. 187, 142nd Leg., 1st Special Sess., 74 Del. Laws, ch. 335, § 4 (2004) (permitting the State Board to "consider a district's plan up to a maximum of three times").

letter to Christina in late 2004, which invited the District to take the opportunity presented in the amendment to submit a conforming plan.[142] That letter also includes a date certain for action by Christina that is most rationally read as a compliance deadline after which the State Board could decide to refer the matter to the Attorney General.[143]

Christina's second argument for avoiding the NSA's mandatory terms departs from the statutory text and focuses on the uniquely difficult issues created by the District's geography. Although Christina is undeniably hampered by its responsibility for two non-contiguous territories, neither the General Assembly nor the State Board of Education excused Christina from compliance with the Act on those grounds. Instead, the Act provided a rubric of "substantial hardship" within which Christina could argue for deviations from the NSA's rigid mandate of geographic proximity. But, that rubric actually emphasizes the priority that the General Assembly demanded be given to neighborhood schools because it requires Christina to hew as closely to the statutory focus on proximity as practicable and to justify any deviation from that focus on a case-specific "substantial hardship" basis.

Likewise, the NSA enabled Christina to present an "addition[al]" plan using grade configurations other than those referenced in the Act.[144] But that plan could only supplement, not replace, a plan that complied with the Act's grade configurations. By comparing the two plans, the State Board could evaluate whether a deviation from the Act's grade configurations was justified, in light of the circumstances fac-

ing Christina. But, because Christina never presented a compliant plan using the statutory grade configurations and existing resources, the State Board could never perform its statutorily-contemplated role of evaluating the merits of Christina's preference for an alternate solution.

In light of this argument, it is critical to note that Christina does not seek to justify its previous non-compliance with the NSA on the grounds that the NSA is unconstitutional. Christina has not challenged its ability to follow the NSA and honor its constitutional obligations. As a result, this court's duty is to require Christina to meet its statutory obligations.[145] If, in the course of performing those obligations, Christina faces, as it will, difficult educational questions posing compelling and morally-perplexing choices about how to best serve its students, particularly those in poverty, it has the discretion to frame its answers within the Act's own nomenclature—as involving substantial hardships justifying a departure from the statute's focus on geographic proximity in assignment. But it cannot use those questions as a justification for avoiding its responsibility to present an Act-compliant plan to the State Board.

Relatedly, Christina has not argued that the NSA, as plainly read, produces absurd results. That would be difficult to do, as § 223 of the NSA implicitly recognizes, through its suggestion of inter-district solutions among others, the difficulty Christina might have given its non-contiguous and socio-economically diverse District. But the General Assembly clearly decided to impose on Christina the same mandatory duty to develop and implement

142. JX 44.

143. *Id.*

144. 14 Del. C. § 223(b).

145. The plaintiffs have not challenged the constitutionality of the NSA in this action, rather, they seek to require Christina to adhere to it.

a compliant Neighborhood School Plan using its existing configurations that it imposed upon the other Northern NCC Districts. It relegated consideration of a more rational system of geographically-compact and contiguous districts to a process that could not be enforced in a judicial forum, while clearly holding the Districts responsible to citizens for developing and beginning to implement Act-compliant Neighborhood School Plans *before* any rational implementation of a plan to redraw the boundaries of the Northern NCC Districts could be implemented.[146]

In this same regard, Christina's argument that the NSA poses down-the-road issues for districts after securing initial approval of their Neighborhood School Plans is also unavailing. Christina is correct that the NSA raises nearly as many questions as it answers in this regard because the Act is entirely silent about what process, if any, it requires beyond the implementation of an initial Neighborhood School Plan.[147] Inevitably, as populations shift, buildings age, and other considerations change, school districts will have to alter feeder patterns, open and close buildings, and make other decisions that affect where students go to school.[148] Christina aptly notes that the NSA says not a word

about how the four Northern NCC Districts have to go about changing a previously-approved Neighborhood School Plan. But that problem is not the one facing Christina and its enigmatic nature does not aid the District. Christina has never fulfilled its statutory obligation by obtaining approval of an Act-compliant plan, and thus, having never complied in the first place, it cannot now rely on the interpretative problems that might arise under the Act if, in the future, it does.

### B. *Are Plaintiffs Entitled To An Injunction?*

The more difficult question I must address is whether to issue the injunction the plaintiffs seek.[149] The plaintiffs' position is rather straightforward. The school closest to some of the plaintiffs' children is Elbert–Palmer. Christina proposes to close that neighborhood school, but not in the context of implementing a Neighborhood School Plan that the State Board has approved as complying with the NSA. Within a few years, Christina proposes closing three other Wilmington schools, which will result in all K–5 City students being assigned to two extremely large, extremely high-poverty schools, Bayard and Ban-

---

**146.** *See* 14 Del. C. § 222 (putatively requiring action on recommendations of the Wilmington Neighborhood Schools Committee by June 30, 2001); 14 *Del. C.* § 223 (requiring affected districts to submit Neighborhood School Plans to the State Board by November 15, 2001 and to implement them within 18 months of receiving transition funding).

**147.** The State Board noted the uncertainty in the NSA concerning its long-term impact, but refused to try to clarify this matter as it was not necessary to the matters pending before it. JX 10 at A323 n. 49.

**148.** These powers are granted in plenary fashion to school boards in Title 14 of the Delaware Code, but they are subject to "Delaware law and the policies, rules and regulations of

the State." *E.g.,* 14 Del. C. § 1043 (granting school boards the authority "to administer and to supervise the free public schools").

**149.** This inquiry combines the irreparable harm and balancing of the equities analyses that are at times divided as separate elements in injunction analysis. *See In re Netsmart Technologies, Inc. S'holders Litig.,* 924 A.2d 171, 2007 WL 1576151 (Del.Ch.2007) (unifying these analyses and explaining that the irreparable harm and balance of the equities inquiries of the injunction standard of review are together "designed to help the court determine whether the powerful tool of an injunction should be used or whether the court should stay its hand, let events proceed, and address any harm [after the fact]").

croft. For City kids in grades 6–12, they face spending all those years in Suburban schools over 15 miles from home.[150] By contrast, for Suburban students in Christina, the District's plans, if implemented through the completion of the Astro School in accordance with the recently adopted Strategic Plan, will enable them to spend all 13 years—the full K–12 span—in schools in the Suburbs. As I understand it, the plaintiffs view Christina's approach to neighborhood schools in terms that bring to mind Chef Emeril Lagasse's term, "one sided tasting food." Suburban kids get to eat from the tasty, seasoned side of the roast, City kids from the side without flavor.

The plaintiffs further believe that Christina's failure to follow the mandates of the NSA has contributed to what they perceive to be this one-sided approach to moving toward a system of neighborhood schools. By abandoning adherence to the process set forth in the NSA or to the Act's substantive provisions, Christina avoids having to account for its respect for the rights afforded to its City students by the NSA, accountability that State Board review would enforce. By seeking an order requiring Christina to make any decisions that would close City schools within the process and using the criteria established by the NSA, the plaintiffs seek the opportunity to influence the direction of Christina's approach to moving toward neighborhood schools, in the forums where the General Assembly determined that community conversation should occur.

The trial in this case was largely taken up by conflicting testimony about the very educational issues the plaintiffs argue should be addressed within the context of the NSA. For example, witnesses for the plaintiffs stressed the educational merits of relatively small schools like Elbert–Palmer, citing educational literature to this effect.[151] The plaintiffs noted that Elbert–Palmer had attained the highest possible rating under the state's educational accountability system, and had an exceptionally admirable lack of disciplinary problems.[152] They fear that the students at Elbert–Palmer will suffer educationally and socially if forced to move to Bancroft, which will become one of the largest elementary schools in the State if the Strategic Plan proceeds in current form. The plaintiffs believe that the prospects for high-population, high-poverty schools to succeed are dim, and they point to the lower rating of and the greater level of disciplinary problems at Bancroft as providing some justification for their fears. Finally, they also note that Bancroft, although only 1.2 miles away, is not in the same neighborhood as Elbert–Palmer. Kids who now walk to Palmer will not be able to walk to Bancroft.[153]

In response, Christina stresses that the core student population at Bancroft performed at about the same level as the Elbert–Palmer population, and attributes Bancroft's lower rating to minor deficiencies, such as the failure to test enough students in certain categories. Christina admits that Bancroft had many more seri-

---

**150.** *Cf.* JX 9 at A290 (expressing the State Board of Education's opinion that a plan requiring City students to commute 15 miles to school for 8 of their 13 years of public education imposed an "unconscionable burden" on them).

**151.** JX 53 at 3–5.

**152.** JX 55 (listing Elbert–Palmer's academic performance rating of "Superior" and documenting a suspension and expulsion rate six times lower than the District's average).

**153.** Bancroft is outside the one mile "walk zone" endorsed by the State Board for K–6 students. JX 10 at A347 n. 76.

ous reportable offenses than Elbert–Palmer—Bancroft leading 109 to 2 in a category where scoring is like golf[154]—but says that Bancroft is implementing a new school climate program like Elbert–Palmer already has in place.[155] Moreover, it points out that Elbert–Palmer does not, with its current feeder pattern, generate enough funding units for a state-funded principal or a counselor, and that scarce local funds must now used for those purposes. By concentrating more students at Bancroft, Christina claims it will be able to lower class sizes and secure funding (such as from federal Title I) for counselors and reading instructors to help high-poverty City students more effectively—although the plaintiffs point out that Christina has not specifically budgeted for these items.[156] Given Christina's cash situation, it also highlights the annual savings of $500,000 it can use for other educational purposes by closing Elbert–Palmer.[157] Lastly, Christina contends that it is only asking Elbert–Palmer students to travel another 1.2 miles, a modest bus ride.

A similar back-and-forth was had over whether Christina could increase the population of Elbert–Palmer and generate funding units for a principal and counselor simply by adjusting feeder patterns. The plaintiffs put on a colorable case that Christina could do just that by assigning the former Drew/Pyle students to Elbert–Palmer, rather than their current assignment to Bayard, especially given that Elbert–Palmer is closer to their homes. Christina had rational, but not compelling, responses. This was, like the debate about whether Elbert–Palmer kids would do as well at Bancroft, a matter over which

reasonable minds could, and apparently do, differ.

Put in the most direct terms, the plaintiffs want to be able to make the case that children in the Elbert–Palmer community should not be forced to give up the small, safe, and effective *neighborhood school* to which they now walk and be forced to attend a huge, high-poverty school with greater disciplinary problems a bus ride away. Before Christina takes such a step, the plaintiffs say that it should convince the State Board that the NSA permits it to do so.

A similar good faith debate was also had at trial over the long-term implications of the Strategic Plan on the ability of City students to attend schools close to their homes in grades 6–12—but the debate was more limited in extent. Because Christina intends to retain ownership of the Douglass and Pulaski facilities and does not plan to close them as schools for another two years, Christina contends that their capacity would be sufficient to allow either Bancroft or Bayard to be converted to a middle school. That is, according to Christina, if Douglass and Pulaski were used for K–5, sufficient capacity in the City would exist to convert Bancroft or Bayard to a middle school.

Notwithstanding that claim, the plaintiffs are dubious (and I perceive rationally so) about the idea of allowing Christina to divest itself of the ability to use Elbert–Palmer for six years, in advance of a coherent process to develop a Neighborhood School Plan for its City students. By closing one neighborhood school from the get-go, and planning to shutter three others,

---

154. *Compare* JX 55 *with* JX 59.

155. Tr. at 299–300, 309.

156. The district indicated that it would hire based on need but admitted that no specific budget numbers had been incorporated in its plans. Tr. at 322–23.

157. *See* JX 17 (operating costs); JX 68 (lease income).

Christina—the plaintiffs fear—will foreclose the opportunity for City students to enjoy a system of neighborhood schools involving smaller elementary school populations at K–5 and a City middle school.[158] As the plaintiffs point out, the current Strategic Plan envisions that City students will spend their K–5 years in schools far larger than the typical Christina Suburban elementary school. As to this point, the plaintiffs also note that if Christina actually guaranteed City kids a stable and consistent attendance pattern within their neighborhoods, its current loss of nearly 500 students to City charters might decrease. Once again, this back-and-forth is a legitimate one, and both sides make rational points.

The limitation of the back-and-forth on this issue is critical, however. Christina's Superintendent candidly admitted that the District's decision to go to referendum only on the Astro School and not to convert Bancroft, too, likely means that there will be no City middle school in Christina for the coming decade.[159] Christina witnesses tried to justify this stark reality by arguing that the creation of a City middle school would, given the demographics of Christina's portion of the City, be educationally improvident. The middle school years are difficult and tempestuous ones for many students, who confront dangerous temptations and new stressors, at a

time when the real world value of a solid education seems awfully remote. That is particularly so, says Christina, for kids in poverty. To form a middle school in which 80% of the students are likely to be poor is a recipe for certain failure.[160] As a result, given that Christina intends to give all its Suburban students a Suburban middle school option (and that charter and choice mean that students without such a Christina option have other viable means of finding a Suburban middle school), the way to guarantee a good school for City students in the middle schools is to deny them any neighborhood school option and to assign them to Suburban middle schools.[161]

Such a decision, as stated in the candid and stark way it was at trial, again highlights the irreconcilable tension Christina faces in implementing the NSA. The State Board found that it was unfair of Christina to implement a system of assignment whereby over 20% of Suburban middle school students would attend a City middle school.[162] At the same time, the State Board found that it was wrong for Christina to propose to create schools with high concentrations of poverty.[163]

If Christina enables all its Suburban students to spend all their school years in the Suburbs, an action that would be wholly consistent with the primary goal of the

---

158. In fact, the evidence the plaintiffs presented suggests that educational outcomes for high-poverty children would be improved (assuming the creation of a system of neighborhood schools) if Christina ran a City system with several small elementary schools and two small City middle schools.

159. Tr. at 413–15.

160. *See* Tr. at 504 (agreeing that the District "foreclose[d] a neighborhood option for the city portion of the district on the theory that if [it] create[d] one, it [would] be a catastrophe from the get-go").

161. At trial, Christina's Superintendent candidly admitted that the District "has made a choice for the kids in the city that they won't have the option of a neighborhood middle school" even though "everyone else will" in order to guarantee them a good school. Tr. at 504–05.

162. JX 9 at A287.

163. *Id.* at A287–88.

NSA, it will necessarily also create high-poverty City schools.[164] Christina's current Strategic Plan acknowledges this and is premised on the creation of two high-population, high-poverty K–5 City schools. But the Strategic Plan goes further. It makes the choice that the best interests of City students requires that they be denied a neighborhood school option for middle school, and that they be protected from parental decisions to choose a City middle school if one existed.[165] That choice might be the educationally and morally sound one, given the unenviable circumstances faced by the City students within Christina.[166] Christina, as a softening factor, notes that the Strategic Plan moves in the direction of the NSA, by creating grade configurations on average for schools more like those specified in the NSA and gives City students one more year at schools closer to home.

■ But it is precisely as to the questions of how, and in what forum, difficult

choices like this should be made on which the remedial calculus tilts strongly in favor of the plaintiffs. Although Christina argues that granting the plaintiffs the relief they seek will involve the court in decisions that educators, and not courts, should make, Christina ignores the actual argument that the plaintiffs make. The plaintiffs do not seek an order preventing Christina from presenting any particular Neighborhood School Plan to the State Board, even one resembling the current Strategic Plan, although that is clearly not the plaintiffs' preference. The plaintiffs just seek to require Christina to develop and justify a plan under the Act that satisfies the State Board as an appropriately fair and equitable one, which gives due weight to the statutorily-relevant considerations, including the interests of City students in having opportunities to attend neighborhood schools.

The plaintiffs' argument is an intensely pragmatic one. The plaintiffs acknowl-

---

164. That is the fact as I find it and as experience demonstrates. Even school districts that have been given special funding to create very expensive urban magnet schools designed to attract suburban students on a voluntary basis have typically had very limited success in doing so. No special funding has been afforded to Christina to create City schools that would rationally entice a student from the Newark area to eschew a school within a couple miles of her home for the chance to ride 15 to 20 miles each way to a City school with similar programming, but having a school population with a much higher poverty level.

165. Christina and the plaintiffs both actually agree that high-poverty schools face a higher likelihood of failure. The plaintiffs and Christina differ in one respect about that issue; the plaintiffs believe that very large high-poverty schools are particularly likely to fail. Both Christina and the plaintiffs also agree that one of the most important reasons high-poverty schools fail is that, despite having a more challenging student body to educate,

they rarely are able to retain effective, experienced teaching staffs, because the rights granted to senior teachers by collective bargaining agreements and the other job opportunities they have available in less challenging schools tend to leave high-poverty schools with the least experienced teachers. The State Board agrees that this is a real problem. *See* JX 10 at A352 ("The problem with high poverty schools is that children in them have less access to effective teachers."); *see also id.* at A363 (noting that national and state data demonstrates that "there is a significant correlation between high poverty schools and schools under [academic] review," and that this is not a problem that can be cured with money).

166. Of course, the logic of that is that the same student body that Christina's Strategic Plan would have attend a large, high-poverty City school together in, say, grades 3–5, cannot successfully do so at grades 6–8. Rather, at that age, those students must be dispersed among several suburban schools for their own benefit.

edge that the Northern New Castle County schools are no longer required to and will not maintain the same kind of racial and socioeconomic balance they did while under federal court supervision. The plaintiffs recognize that Suburban parents in Christina desire to send their children to schools closer to home. Most of all, they recognize that the General Assembly passed a law making geographic proximity the most important factor in school assignments in Northern New Castle County.

What the plaintiffs simply want is for Christina to respect that the NSA grants *all* citizens of New Castle County certain rights. Now that geographic proximity in assignment is the officially required state policy, Christina must follow that policy, but in a way that accords equal rights to City students.[167]

Before Christina closes City schools that City students can walk to, the plaintiffs want Christina to justify that action to the State Board within the context of a Neighborhood School Plan that complies with the Act. Before Christina forecloses City students from the opportunity for neighborhood middle schools, the plaintiffs want Christina to justify that decision within the context of the planning process required by the Act, which forces the District to justify its decisions to deviate from geographic proximity for City students with specificity.[168]

Not only that, the plaintiffs urge the court to use the narrowest, and least intrusive, remedial tool of all. The plaintiffs do not want this court to answer the vexing and important educational issues Christina

167. Another historically-justified concern is obviously implicated by the creation of a continuum of City schools spanning the entire grade span. That is the concern that if a middle school is built in the City, then City students will be denied any guaranteed opportunity to attend a Suburban school. This could leave City students trapped, with no other option than to attend high-poverty City schools that also will be likely to be more racially segregated. In other words, a rational fear exists that rather than giving City students a guaranteed option to choose a City school that is closer to home (but likely to have higher concentrations of poverty) or a Suburban school that is farther from home (but likely to have a lower concentration of poverty), they may have only the first option. If there is a Hobson's Choice between a system where City kids are required to travel to, but are also guaranteed a place in, schools with lower concentrations of poverty, and a system where City kids can only bank on a spot in a high-poverty school, the record indicates that some City residents would opt for the former. The key point for now is that the plaintiffs are entitled to have this debate take place within the framework mandated by the General Assembly in the NSA.

168. In that regard, the NSA makes Christina confront questions about what is most impor-

tant in education, such as whether having the most well-equipped building is better than having a functional building that facilitates parental involvement. In that respect, the choice regarding a City school is a poignant one. Bancroft and Bayard were both built as middle schools. Neither has been renovated in the near past to meet current middle school standards. But many parents would choose a functional middle school, with high-quality teachers and a mile from their home, over a brand new middle school with teachers of equal quality 18 miles away. In making that choice, the parents might value the educational advantages that would come from their greater ability to be involved, and the lower level of stress for their family, that would flow from the more proximate school. Moreover, in an urban environment, it is not unusual for schools, including private schools, to use other facilities (such as parks for athletic playing fields) to supplement their core physical plant, given the typically smaller plot on which urban schools can operate. It is precisely these kinds of questions that the plaintiffs want Christina to address in its Neighborhood School Plan. In doing so, Christina must confront its prior conclusion that Bancroft and Bayard were appropriate facilities for sixth graders, a conclusion reflected in years of assigning sixth graders to those buildings.

faces in implementing an approach to neighborhood schools that is "fair and equitable." [169] They are asking that Christina be required to do that by following the statutorily-required process with all the facilities options currently available still on the table.

As Christina candidly admits, its Strategic Plan does not purport to be an Act-compliant Neighborhood School Plan.[170] But it has the effect of usurping the role of one—one that grants a full continuum of neighborhood schools to Suburban kids, while arguably reducing and foreclosing long-term neighborhood school options for City kids. But Christina is doing that, by its own admission, without having had an explicit "conversation" with its school community about those consequences.[171] Indeed, the trial made clear that many of the long-term implications of the Strategic Plan have not even yet been considered by school officials themselves.

As important, the plaintiffs want Christina to have to answer to the educational experts at the State Board. The plaintiffs do not underestimate the difficulties Christina faces. In fact, one of the most refreshing things about this litigation is the respect that the plaintiffs and Christina have shown each other. Christina has acknowledged the heart-felt concerns of the plaintiffs. The plaintiffs have not engaged in attacks on Christina's motives, just its plans.

The plaintiffs do not question that many of the concerns that Christina has over what to do with their existing facilities—such as whether some schools will be overcrowded and others underpopulated—are legitimate factors for consideration in developing a Neighborhood School Plan. In particular, the plaintiffs realize that it would be a better world if there were no schools with high percentages of high-poverty students, and that Christina is correct to consider the problems such schools present.

The plaintiffs just ask that they be afforded their right to have Christina address these concerns within the statutory framework. As they point out, the State Board has provided other districts with the chance to deviate from the most geographically-proximate assignments on the grounds of substantial hardship.[172] The State Board has already considered assignment patterns causing overcrowding or a high-poverty population as creating a substantial hardship that a district might take into account.[173] The plaintiffs merely seek to require Christina to go through the legislatively required process to justify any denial to City students of an opportunity to attend the schools closest to their home. In the end, that process leaves the ultimate decision whether to approve Christina's decisions to the State Board of Education. That is, the plaintiffs seek to reinforce the primacy of decisionmaking by duly authorized educational authorities, but guided by the policy priority the NSA

169. 14 Del. C. § 220.

170. Tr. at 426 ("[W]hen we [the District] went into the strategic plan, we were not thinking Neighborhood Schools Act.").

171. *Id.*

172. *See e.g.,* JX 10 at A313 (finding that "Seaford's Neighborhood School Plan meets the requirements of Section 223(a) even though it uses school capacity as a factor in making

student assignments" to prevent overcrowding); *id.* at A362–63 (allowing Brandywine School District to "adjust closest-to-home assignments by a poverty factor" because "forcing Brandywine to create high poverty schools would work a substantial hardship to the students in those schools").

173. *Id.*

mandates be placed on neighborhood schools.

The plaintiffs' remedial request is less intrusive than other options available to them under the capacious language of the private right of action established in § 223(f) of the NSA. The plaintiffs do not ask for an injunction until such time as the State Board develops an Act-compliant plan for Christina, even less do they seek to have a court develop such a plan for the District.

All they ask is for Christina to do what is plainly required to do under the NSA before closing four City schools and embarking irrevocably on a Strategic Plan that likely forecloses the creation of City middle schools for the next decade.

Given the important value the General Assembly has placed on neighborhood schools in the NSA, the interests of the plaintiffs in having their statutory rights vindicated outweighs any harm that will befall the District if an injunction issues. In the short term, the costs of an injunction will deprive Christina of budget savings of a half-million dollars next year. But those costs are outweighed by the injury that might result to the plaintiffs if Elbert–Palmer, a successful neighborhood school for City students, is closed as the result of District decisions that do not comply with the Act. Even more, if an injunction does not issue now, the District will lose control of Elbert–Palmer for six years.[174]

The more delicate question is the scope of the injunction that should issue. On this question, the plaintiffs have been more than a tad ambivalent. At the post-trial oral argument, they initially took the posi-

tion that they were only seeking to enjoin the closing of Elbert–Palmer as an elementary school for next year, and the proposed closing of the other City schools, pending Christina's compliance with the NSA. The plaintiffs did not, they said, want to enjoin all the aspects of the Strategic Plan.[175] After Christina had its turn to argue, the plaintiffs changed their mind and asked for a broader injunction requiring Christina to maintain their existing feeder patterns and schools in the form they are in during the present school year until a Neighborhood School Plan consistent with the NSA is approved.[176]

In my view, the plaintiffs' original position is closer to the mark. The harm that the plaintiffs face that is imminent and irreparable is the closing of Elbert–Palmer. If Christina is permitted to shutter that school and disperse its faculty and students, it will be almost impossible to put things back together without great disruption to all affected constituencies, especially its current student body. At a minimum, an injunction to prevent that is in order. Likewise, Christina shall be enjoined from taking further steps to close its remaining City schools until Christina obtains approval for those decisions within the context of an approved Neighborhood School Plan. As Christina prepares to comply with the NSA, the full range of City facilities should be available for consideration.

I decline, however, to go further than that for now. For example, I see no reason to enjoin Christina from providing greater neighborhood school opportunities immediately to its Suburban students using its existing facilities. That direction has been embraced by Christina, is consis-

---

174. This court could not responsibly allow Edison to open a new school at Elbert–Palmer this September, only to evict it next September.

175. Tr. at 567–73.

176. Tr. at 621–22.

tent with the policies expressed in the NSA, and there is little utility to providing a false and undoubtedly very temporary stop to it; moreover, such a halt bears no sustainably-useful relation to the plaintiffs' desire to preserve their own neighborhood school options. Furthermore, I do not think it is prudent for the court to issue a detailed injunction freezing all aspects of Christina's school assignment policies, when the more limited injunctive relief identified above is sufficient to protect the plaintiffs from any irreparable injury.[177]

More troubling is the question of whether to enjoin Christina from going to referendum solely on the Astro School. Arguably, if Christina is successful in that regard, it will have an excuse to claim that its only facilities that are fit to be middle schools are in the Suburbs, and to thereby deny a City middle school option to City students. I am not persuaded, however, that Christina is in a position now to claim that none of its City facilities can be operated as a successful middle school. More important, I am not persuaded that the State Board lacks the authority to take Christina's decision to abandon a plan to renovate Bancroft into account in determining whether Christina's Neighborhood School Plan complies with the NSA. And, in that respect, there is no question that the State Board, with the support of the Executive and Legislative Branches,[178] is better positioned than this court to come up with an ultimate solution for Christina that guarantees to all its students the ben-

efits the General Assembly believed would flow from neighborhood schools. In that same regard, there is also no reason to assume that Christina will not consider the implications of its need to comply with the NSA on its decision to proceed to referendum on the Astro School alone, or that it will refuse to reconsider whether to also seek funding for renovations to Bancroft as part of the same referendum. By terms of the injunction, Christina will be directed to immediately embark on the development of a compliant Neighborhood School Plan, a process that logically requires it to reconsider the role of the Astro School within the larger context of the rights afforded to all the District's students by the NSA. To do that with good faith toward the legal rights and educational interests of City students, Christina must consider whether procession with constructing the Astro School in isolation unfairly endangers the later ability of the District to secure funds that might be needed to renovate a City middle school. I am reluctant to premise an injunction in the assumption that Christina will not take that obligation seriously, and presume just the opposite, which is that Christina will not seek the completion funds for the Astro School in isolation if it determines that that course of action will foreclose the creation of a City middle school as a possible feature of its Neighborhood School Plan. In refraining from enjoining the referenda of the Astro School at this time, I also take into account the reality that Christina's voters

177. Very difficult decisions have to be made about the best interests of City students. For example, if in the near term, Christina is going to run all of its grade 6–8 middle schools in the Suburbs, it would arguably injure sixth grade City students to keep them in the City for that grade. By doing so, those students would enter middle school—an already challenging time—in seventh grade, when most of the students at their schools would have started in sixth grade. Any

Neighborhood School Plan will have to confront hard issues of this kind. I decline the plaintiffs' invitation to have me issue an injunction that locks in every aspect of the status quo during the period until Christina comes into compliance with the NSA.

178. And with the legal help of the Attorney General if that is required to enforce the NSA.

first approved funding for the Astro Power and Porter Road projects in 2002, without objection from the plaintiffs.[179] The Astro School now stands half-built, and Christina is only seeking the funds necessary to complete that school.[180] The costs of an injunction preventing Christina voters from deciding to complete this project seem greater than any arguable benefit such an action would provide the plaintiffs, so long as Christina proceeds in the good faith manner just outlined.

Regardless of the more limited nature of the injunction that will issue, it remains regrettable that this court must enjoin any aspect of a burdened school district's plans. But the plain terms of the NSA dictate this course of action. And Christina is well-positioned to limit the duration and extent of any injunction by seriously and expeditiously engaging in the development and submission of a compliant Neighborhood School Plan.

If Christina believes that it urgently needs help from the General Assembly or from other neighboring districts in that process—and its briefs and trial arguments evince that it holds that belief and the evidence overwhelmingly supports the rationality of that belief—it is up to Christina to seek such help. But the absence of legislative action to change Christina's boundaries provides no justification for denying Christina's City students the rights granted to them by the NSA. The avoidance of the analytical and equity-enforcing rigor of State Board review that is involved with Christina's current approach to addressing demands for neighborhood schools is even less likely to generate "fair[ness] and equit[y]," [181] than requiring compliance with the law as written. Indeed, refusing to enforce the Act at the instance of the plaintiffs would be the least equitable option of all, allowing Christina to move without State Board review towards a system of neighborhood schools that is fair and equitable for its Suburban students, while alleviating any responsibility on the part of Christina and state policymakers to address the resulting burdens and lack of equal neighborhood school opportunities for Christina's City students.

### IV.  *Conclusion*

For all these reasons, I find for the plaintiffs as to their claim that Christina has violated the NSA. A final judgment and permanent injunction consistent with this decision shall issue, upon the submission by plaintiffs of a conforming order, after notice as to form to the defendants. Each side shall bear its own costs.

179. As to this, I note that Christina did not advance a laches argument in its trial briefs. Thus, any such argument was waived. *E.g., Emerald Partners v. Berlin,* 2003 WL 21003437, at *43 (Del.Ch.2003), *aff'd,* 840 A.2d 641 (Del.2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief."). The reason Christina may not have made the argument was that it was not apparent that Christina had abandoned its attempts to comply with the NSA until the last months of 2004, at the earliest, a time less than three years before this action was filed. *See* 10 Del. C. § 8106 (subjecting actions based on statutes to a three-year limitations period). In the same vein, plaintiffs cannot be said to have delayed in filing this lawsuit as they moved for relief with urgency once Christina proposed to close four City schools, making plain the District's intent not to maintain those institutions as neighborhood schools.

180. It is true that the current plans will make the Astro School a K–8 rather than a 6–8 school. But the previous plans, approved by referendum, to build a Suburban elementary school at Porter Road have been shelved.

181.  14 Del. C. § 220.